FILED
IN OPEN COURT

APR 1 2011

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 1:11cr165 |
| PAUL ALLEN | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The United States and the defendant, PAUL ALLEN, agree that had this matter proceeded to trial the United States would have proven the facts set forth in this Statement of Facts beyond a reasonable doubt. Unless otherwise stated, the time periods for the facts set forth herein are at all times relevant to the charges in the Information.

### I. OVERVIEW

1. On or about August 1, 2003, the defendant joined Taylor, Bean & Whitaker Mortgage Corp. (TBW), in Ocala, Florida, as its Chief Executive Officer. The defendant reported directly to the chairman of TBW, Lee Farkas. The defendant worked primarily out of his home in Oakton, Virginia, which is in the Eastern District of Virginia.

2. From in or about 2005 through in or about August 2009, co-conspirators, including the defendant, engaged in a scheme to defraud investors in Ocala Funding. One of the goals of the scheme to defraud was to mislead investors and auditors about Ocala Funding's assets. This aspect of the fraud scheme allowed TBW to misappropriate over $1 billion in collateral from Ocala Funding. By participating in the fraud scheme described below, the defendant knowingly and intentionally misled investors in Ocala Funding in order to induce

them to invest in the facility and/or to dissuade them from pulling their investments out of the facility.

## II. OCALA FUNDING

3. In or about January 2005, TBW established a wholly-owned special purpose entity called Ocala Funding. Ocala Funding was a bankruptcy-remote facility designed to provide TBW additional funding for mortgage loans. The facility obtained funds for mortgage lending from the sale of asset-backed commercial paper to investors.

4. Ocala Funding was managed by TBW and had no employees of its own. The defendant served as the lead manager of Ocala Funding. The defendant knew and understood that Ocala Funding's assets, including mortgage loans and cash, had to be greater than or equal to its liabilities, including outstanding commercial paper held by investors and a relatively small amount of subordinated debt.

5. Shortly after Ocala Funding was established, the defendant learned that there was a shortage of assets in Ocala Funding. By in or around September 2006, the collateral deficit had grown to about $150 million, by September 2007 it had grown to about $500 million, and by June 2008 the hole had grown to over $700 million. The defendant kept Farkas informed about the significant collateral shortfall at Ocala Funding and requested Farkas to take corrective action.

6. Although the defendant had difficulty obtaining information from TBW's treasury department, he learned that cash from Ocala Funding was being used by TBW for purposes unrelated to Ocala Funding. The defendant never directed anyone at TBW to use cash from Ocala Funding for purposes unrelated to Ocala Funding.

7. In an effort to cover up the collateral shortfall and to mislead investors, the defendant told a co-conspirator to produce reports that concealed the shortfall in Ocala Funding. The defendant knew that these materially misleading reports were sent to Ocala Funding investors and to other third parties.

8. On or about June 30, 2008, TBW restructured the Ocala Funding facility. The new facility consisted of two investors, Deutsche Bank and BNP Paribas, and was capped at $1.75 billion. At that time, Ocala Funding had a collateral shortfall of approximately $700 million. The defendant understood that cash from the new investors was used to pay down investors in the old facility.

9. In or about the fall of 2008, Farkas told the defendant that Farkas had moved the hole from Ocala Funding to Colonial Bank. Although the defendant did not know how Farkas had moved the hole, the defendant believed that Farkas could not have legitimately moved the hole to Colonial Bank under the terms of the financing agreements between TBW and Colonial Bank that existed at the time.

10. At or about the time that TBW ceased operations in August 2009, Ocala Funding had outstanding commercial paper of approximately $1.7 billion. The defendant learned shortly thereafter that Ocala Funding had less than $200 million in collateral.

11. As the government would prove at a trial, as a result of the Ocala Funding fraud scheme, Freddie Mac, Colonial Bank, and the Ocala Funding investors believed they had an undivided ownership interest in thousands of the same mortgage loans.

12. The defendant did not personally receive any funds TBW misappropriated from Ocala Funding.

## III. THE $300 MILLION CAPITAL RAISE

13. In or about December 2008, the United States Treasury Department conditionally approved $553 million of TARP funding to Colonial BancGroup if, among other things, Colonial BancGroup could first raise $300 million in private capital (Capital Raise).

14. In or around February 2009, TBW began to lead the Capital Raise and undertook efforts to recruit investors. As part of this effort, in late March 2009, Farkas directed the defendant to contact a potential private equity investor (Investor 1) to gauge his interest in investing. The defendant spoke with Investor 1 on a number of occasions, but Investor 1 was unable to participate in the Capital Raise. The defendant informed Farkas that Investor 1 could not invest. Nevertheless, as the defendant knew, Farkas represented to others that Investor 1 was a $50 million participant and the alleged agreement to invest $50 million was material to Colonial BancGroup's March 31, 2009 public announcement that it had met the $300 million capital raise contingency. In addition, at Farkas's direction, the defendant called Investor 1 on or about April 1, 2009, and suggested ways in which Investor 1 could be a straw investor with TBW providing the necessary money.

15. The defendant also knew that, to signify Investor 1's intention to invest in the Capital Raise, Farkas arranged to deposit $5 million in the name of Investor 1, without Investor 1's knowledge or permission, into an escrow account. The defendant learned that this money had come from Ocala Funding and knew that a misleading letter had been sent to the FDIC falsely confirming that all investors had met the 10% escrow deposit requirement.

16. On or around April 6, 2009, during a meeting with Colonial BancGroup senior management and others at Colonial BancGroup headquarters in Montgomery, Alabama, the

defendant informed Colonial BancGroup that Investor 1 was unable to participate in the Capital Raise but did not disclose that Investor 1 had not been an actual investor.

17. Colonial Bank never received any TARP funds.

## IV. FALSE STATEMENTS TO HUD

18. Pursuant to applicable Guaranty Agreements between TBW and Ginnie Mae, TBW was required to submit to Ginnie Mae, a wholly-owned government corporation within the U.S. Department of Housing and Urban Development, by June 30, 2009 audited financial statements for TBW's fiscal year ending on March 31, 2009.

19. In or around mid-June 2009, TBW's independent auditor, Deloitte LLP (Deloitte), notified Farkas that it had serious concerns about certain debt transactions between TBW and Colonial Bank. Deloitte also recommended that TBW retain outside counsel to conduct an independent investigation into the matter. On or around June 19, 2009, TBW retained the law firm of Troutman Sanders LLP (Troutman) to investigate issues raised by Deloitte.

20. On or about July 6, 2009, the defendant sent a letter to Ginnie Mae that attributed TBW's delay in submitting audited financial statements to TBW's switch to a compressed 11-month fiscal year, TBW's acquisition of Platinum Bancshares, Inc., and TBW's planned equity investment in Colonial BancGroup. The defendant's letter intentionally omitted disclosing the material facts that Deloitte had raised concerns about the propriety of the financing relationship between TBW and Colonial and that TBW, at Deloitte's request, had retained Troutman to conduct an investigation into the matter.

## V. CONCLUSION

21. The defendant admits that this statement of facts does not represent and is not intended to represent an exhaustive factual recitation of all the facts about which he has knowledge relating to the scheme to defraud as described herein.

22. The defendant admits that his actions, as recounted herein, were in all respects intentional and deliberate, reflecting an intention to do something the law forbids, and were not in any way the product of any accident or mistake of law or fact.

Denis J. McInerney
Chief, Criminal Division, Fraud Section
United States Department of Justice

By: _____
Patrick F. Stokes, Deputy Chief
Robert Zink, Trial Attorney

Neil H. MacBride
United States Attorney

By: _____
Charles F. Connolly
Paul J. Nathanson
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, PAUL ALLEN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate to the best of my knowledge, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 4/1/11

Paul Allen
Defendant

I am PAUL ALLEN's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 4/1/11

Aitan Goelman, Esq.
Miles Clark, Esq.
Counsel for the Defendant