**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | |
| ) | **CRIMINAL NO. 1:11cr165** |
| **PAUL ALLEN** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S SENTENCING MEMORANDUM AND POSITION
WITH RESPECT TO SENTENCING FACTORS AND MATERIAL FACTS**

**INTRODUCTION**

COMES NOW the defendant, Paul Allen, by undersigned counsel, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines or U.S.S.G.") § 6A1.2 (Nov. 2010) and hereby submits this memorandum in aid of sentencing which is scheduled for June 21, 2011. On April 1, 2011, Paul Allen entered a plea of guilty to a two-count Criminal Information. We respectfully request that the Court sentence Paul Allen to a minimum term of incarceration and home detention that reflects the serious nature of the conduct to which he pleaded, yet which credits him with his extensive cooperation and trial testimony and recognizes that, although he was the titular Chief Executive Officer ("CEO") of Taylor, Bean and Whitaker ("TBW"), his title far exceeded his operational control as he was repeatedly denied access to critical information on the company's financial transactions and overall financial health.

We ask the Court to consider the following salient factors, which will be addressed in greater detail in the pages that follow:

- But for the conduct to which he pled guilty, Paul Allen has been a model citizen, a loving and supportive husband, father and son, a contributing member of the Northern Virginia community and a highly regarded and respected figure in the fields of education and finance.

- The conduct pleaded to was part of a conspiracy that was not devised or initiated by Paul Allen, but rather by Lee Farkas and five of his co-conspirators - Raymond Bowman, Desiree Brown, Teresa Kelly Catherine Kissick and Sean Ragland - prior to Paul Allen's joining TBW. In fact, when Paul Allen joined TBW, in late 2003, the initial part of the five separate schemes had already commenced, unbeknownst to him.

- Upon his arrival at TBW, Paul Allen was immediately, and thereafter continually, denied access to financial information by Farkas and communication with TBW's Treasurer Denise Brown and although Paul Allen was clothed in the title of CEO in form, in function, he was anything but.

- Significantly, during his entire tenure at TBW, Paul Allen was unaware of, let alone involved in, the first three and arguably the most pernicious aspects of the TBW fraud which were, as described by the government, the Overdraft/sweeping scheme, the Plan B on COLB scheme and the Plan B on AOT scheme. Collectively, these formed the genesis of the "hole."

- Paul Allen brought the hole in Ocala Funding to Farkas's and Bowman's attention when he first became aware of it in late 2005. Paul Allen repeatedly complained to Farkas about the hole in Ocala Funding. Paul Allen urged Farkas to fix the hole several times. For a significant period of time, Paul Allen was told by Farkas that it would be fixed and he believed that it would be fixed. In fact, in late 2008, Farkas represented to

2

Paul Allen that the hole in Ocala Funding was fixed. Farkas, Paul Allen's boss and the primary owner of TBW, lied to Paul Allen.

- In August of 2009, when TBW collapsed, Paul Allen was the only TBW senior executive to stay in Ocala for a period of time in an effort to assist TBW's creditors and the bankruptcy trustee.

- As indicated in Paragraph 6 of the Statement of Facts in support of his Plea, Paul Allen never directed anyone at TBW to use cash from Ocala Funding for purposes unrelated to Ocala Funding. Paul Allen was also never involved in the movement of mortgage loans to or from other warehouse lines to Ocala Funding, or vice versa.

- As indicated in Paragraph 12 of the Statement of Facts in support of the Plea, Paul Allen did not personally receive any funds appropriated from Ocala Funding.

- And finally, Paul Allen has rendered, and continues to render, substantial assistance to the government in its investigation and its understanding of the intricacies of the mortgage fraud, including, but not limited to, providing invaluable trial testimony against Farkas over a two day period.[1]

### I. PAUL ALLEN'S BACKGROUND AND CHARACTER

Paul Allen is a 55 year old married father of one daughter and two adopted sons. He has been married to his wife, Denise Allen, for nearly ten years. Together, he and his wife adopted two boys as newborns. They are now age 6 and 7. Additionally, Paul Allen has a 16 year-old daughter from his previous marriage to his former wife, Edith Farley (formerly "Edith

---

[1] Prior to his sentencing, Paul Allen will appear, at the request of its Inspector General, before the Federal Housing Finance Agency to discuss in general terms the TBW mortgage fraud and to assist the government in its understanding of and efforts in preventing mortgage fraud from occurring in the future.

3

Loumiet"). Paul Allen has one sibling. His mother is a 92 year old widow living in Atlanta, Georgia. His family is very important to Paul Allen and, in addition to his immediate family; he is very close to his sibling, mother, extended family and his former wife for the benefit of their daughter.

Paul Allen rose from modest beginnings. He was the first member of his family to attend and finish college. He earned a B.A. and a M.B.A. from Tulane University. Then, he matriculated at the University of Washington as a doctoral student in finance. Thereafter, he returned to Louisiana to accept a position as a professor at Louisiana State University. In 1986, he left Louisiana State University to join Freddie Mac. After serving in a variety of roles at Freddie Mac, Paul Allen was recruited to join Fannie Mae in 1994. In 1998, Paul Allen accepted the opportunity to become CFO of North American Mortgage Company, a subsidiary of Dime Bancorp. In late 2003, Paul Allen joined TBW as its CEO.

Paul Allen's background and industry credibility were critical to Farkas and TBW. When hiring Paul Allen in the late summer of 2003, Farkas told the TBW employee base that Paul Allen "possesses the skills, respect and contacts that TBW needs" while at the same time noting that Paul Allen "lives near Washington, D.C. and will continue to live there." Farkas knew that Paul Allen's credibility would give TBW the illusion of propriety when - in fact - Farkas purposely kept Paul Allen from knowing what was really occurring at TBW.

As the numerous letters of support attached to the Presentence Investigation Report ("PSR") clearly demonstrate, Paul Allen has led his life as a devoted husband and father, an active community and church member, a scholar, a business executive and an otherwise exemplary citizen. With the exception of a two year period in the late 1990's, Paul Allen has lived in Northern Virginia (Fairfax County) since 1986.

It is impossible to discuss Paul Allen without further highlighting the depth of his devotion to his family and the community at large. Paul Allen joined TBW in large part to stay close to his daughter Rachel who was eight years old at the time of his hire and who still primarily lives with her mother in Tampa, Florida. Paul Allen also took the TBW job to be close to his wife's parents (who live close to Ocala, FL) and to see his elderly mother and his sibling regularly in Atlanta, Georgia (where TBW had a large operations center). Paul Allen adores his children and is devastated by the thought of having to be apart from them, particularly so for his adopted elementary school-aged sons. Both of his adopted children's biological mothers battled substance-abuse problems during their respective pregnancies, resulting in pre-natal exposure to illicit substances. Despite being born "at risk", their sons have been the beneficiaries of love and devotion by Paul Allen and his wife.

Paul Allen is very active in the Reston, Virginia Little League, serving as an officer, board member, league commissioner, coach and organizer of various activities. His tireless efforts were acknowledged when he was named "Volunteer of the Year." Additionally, Paul Allen is very active in his church, volunteering for various roles in the church's youth religious education services and teaching second grade Sunday School.

While repentant for his actions and accepting their consequences, Paul Allen's greatest concerns are for the well-being of his sons in his absence and the ramifications on their development at this precarious stage of their lives. Paul Allen's brother-in-law is Dr. J. Eric Vance, a child psychiatrist working with high-risk youth as Chief Consulting Psychiatrist, Division of Juvenile Justice, for the New Hampshire Department of Health and Human Services. As noted in Dr. Vance's letter of support, Paul Allen's sons have made great strides in their emotional status, due to their parents' ready engagement in school and extracurricular activities,

5

the disruption of which may have grave emotional consequences for them. As Dr. Vance states, Paul and Denise Allen have provided their sons with "safe and structured homes, with loving attachments to emotionally steady parents, discipline with discussion, supportive relationships with extended family members, the value of education, and plenty of time spent on building skills and activities to foster self-esteem." Paul and Denise Allen also are very active in their sons' school, often doing volunteer work and meeting regularly with teachers to gain more insight into their children's development.

Paul Allen hopes to impart upon his children the dignity of accepting the consequences of one's actions. Paul Allen does so with his sole fear being the well-being of his family in his absence.

## II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Paul Allen has pleaded guilty to a two-count Criminal Information charging him with Conspiracy to Commit Bank Fraud, Securities Fraud, and Wire Fraud in violation of Title 18, U.S.C., §§ 371, 1344, 1348 and 1343 and with making a False Statement in violation of Title 18, U.S.C., § 1001. Paul Allen acknowledges the severity and the nature and circumstances of the charges he has pleaded to and, as indicated in the PSR filed with this Court, fully accepts responsibility for his conduct and the harm caused thereby. Without in any way diminishing his acceptance of responsibility, Paul Allen asks the Court to take note of the salient factors set forth in the Introduction of this Memorandum.

We ask the Court to look at Paul Allen's role in the offense given the limitations he had as TBW's titular CEO. Paul Allen was recruited by TBW as its CEO in the second half of 2003, a full year after the Farkas-led conspiracy had commenced. He knew that he was entering a challenged financial situation, but was totally unaware that he was entering an existing criminal

enterprise. A review of the trial testimony in the Farkas prosecution clearly describes Paul Allen's role as CEO of TBW. He was immediately and continuously denied access to Desiree Brown, TBW's Treasurer, as well as to significant financial and cash flow information. Concerning asset deficiencies in Ocala Funding, Paul Allen regularly reported his concerns to Farkas and made recommendations which he believed would benefit TBW and fix the problem. Paul Allen's concerns were given lip service, and his recommendations were disregarded. At the same time, the published (and audited) financial information showed a healthy, growing and successful company that lulled him into a false sense of security that all was well at TBW on a consolidated basis. In hindsight, he wishes he had been more probing and more insistent at being provided a complete financial picture. He was wrong and irresponsible for not doing so.

It is also clear in the Farkas trial transcripts that in addition to being kept in the dark concerning key financial realities of TBW, Paul Allen was completely unaware of substantial aspects of the TBW fraudulent scheme which the government has identified as the Overdraft/sweeping scheme, the Plan B on COLB scheme, and the Plan B on AOT scheme. These schemes involved the other conspirators disguising tens of millions of dollars of overdrafts as payments related to Colonial Banks purchase of legitimate TBW's mortgage loans. Farkas and the other co-conspirators caused TBW to provide false mortgage loan data to Colonial Bank under the pretense that it was selling interest in mortgage loans, when Farkas and the other conspirators very well knew that the data included information on loans that TBW had already committed or sold to other third party investors or did not even exist. All other co-conspirators who have pleaded in this matter, and Farkas, who was found guilty after a jury trial, were involved in the Overdraft/sweeping scheme, the Plan B on COLB scheme, and the Plan B on AOT scheme. Paul Allen was not. The significance of Paul Allen's non-involvement is best

highlighted in reviewing the transcript of the government's closing argument at the Farkas trial.[2]

At the very beginning of his closing argument, Assistant United States Attorney Charles Connolly, arguably at its most critical part, stated:

> "I don't remember what Plan B was." Those were the incredible words that the defendant, Lee Farkas, said under oath in this very courtroom on Friday afternoon: "I don't remember what Plan B was."

> Transcript of AUSA Connolly's Closing Argument at 4 (Lines 20-23), *United States v. Farkas*, Criminal No. 1:10cr200 (E.D.Va. 2011).

AUSA Connolly further described Farkas:

> Ladies and gentlemen, he lied. He lied because Plan B was a crime and it was a key part of a conspiracy. It was a crime of not only staggering proportions but staggering boldness. It involved selling hundreds of millions of dollars in fake assets to a bank in return for real money.

> *Id.* at 5 (Lines 4-11).

He further stated:

> Desiree Brown put it best when she testified: "*It was stealing. You can't give Colonial Bank nothing, take money from them, and not know you are stealing.*"

> *Id.* at 5 (Lines 9-11) (emphasis added).

Later in his closing argument, AUSA Connolly specifically focused on Paul Allen:

> Paul Allen. Paul Allen was the former CEO of TBW. Paul Allen knew nothing about Plan B, and the defendant confirmed this. If Plan B was a legitimate means of getting additional money from Colonial Bank, don't you think the defendant would have told his CEO about it?

> Allen testified to the fact that he was cut off from Treasury almost as soon as he started, and although the defendant corroborated this as well, the reason he gave does not hold up. Common sense tells you that the CEO should have access to all departments and certainly the Treasury Department.

---

[2] To the extent that the Court is certainly familiar with the testimony and the facts of this case, we ask for the Court's indulgence for its recitation, as we consider it integral for an appreciation of Paul's role in the conspiracy.

> The reason the defendant did not tell his CEO about Plan B is because he didn't want Plan B discovered. In fact, that is why the defendant sent Allen the "I am going to kill you" email after learning that Allen had a conversation with Colonial Bank. There is simply no logical explanation for that email other than the fact that the defendant wanted to cover up his ongoing fraud scheme with Colonial Bank.

*Id.* at 15 (Line 25), 16 (Lines 1-16).

These closing remarks by AUSA Connolly are telling on several levels. They first indicate that Paul Allen, although titled a CEO, certainly was not afforded the responsibility, financial information or overall access and oversight of a CEO. Also, the government's closing and the testimony in the Farkas trial confirms that Paul Allen had nothing to do with three very significant components of the TBW scheme, aspects of which commenced prior to Paul Allen joining TBW. Moreover, Paul Allen did not know anything about the schemes involving Colonial Bank during his entire tenure at TBW. The first Paul Allen learned of Plan B was when he read the Farkas indictment in June, 2010.

On another level, the remarks by AUSA Connolly significantly suggest that if Paul Allen had been aware of the Plan B schemes which Desiree Brown characterized as "stealing," Paul Allen would not have remained silent - something that Farkas instinctively knew. The purpose of citing the transcript is not to diminish responsibility for what Paul Allen was involved in but rather to highlight what he was not involved in and to demonstrate what Paul Allen's true role as CEO entailed and, more importantly, did not entail. We submit to the Court that Paul Allen's ignorance of the Plan B schemes are significant in determining his sentence, as it illustrates just how far removed he was kept by Farkas from not only the TBW Treasurer and Colonial Bank but also from core features of the criminal activity.

Again, we ask the Court to consider that, of the government-characterized five components of Farkas's orchestrated and evolving conspiracy, Paul Allen was never involved in

9

the first three; the Overdraft/sweeping scheme, the Plan B on COLB scheme and the Plan B on AOT scheme. It is respectfully suggested that this is critical in the Court's assessment of Paul Allen's culpability and ultimate sentence, for the following reasons. From a chronological and durational point of view, the Overdraft/sweeping scheme commenced in 2002, a full year prior to Paul Allen joining TBW. Paul Allen did not become aware of the asset deficit problem in Ocala Funding until late in 2005, as both his Plea and supporting Statement of Facts indicate. This was three years during which Paul Allen was not involved in, or aware of, any aspect of the TBW conspiracy. This was three years when Paul Allen was not involved in the three components of the scheme which were the most pernicious and the most responsible for creating the "hole". This was three years in which Paul Allen, although CEO in title, was kept in the dark of financial information or afforded the opportunity to act like the CEO of TBW. And finally, this was the three year period in which the fates, and eventual demises, of TBW and Colonial Bank were etched in stone. When he first learned of the enormity of the hole at TBW - as he recounted to AUSA Connolly in his trial testimony - Paul Allen "felt sick to his stomach."

      The above is highlighted not to diminish the significance of the conduct to which Paul Allen pled to before this Court, but it is support of our asking for leniency when the Court considers what sentence is sufficient but not greater than necessary in sentencing Paul Allen and in assessing the § 3553(a)(1) nature and circumstances of his involvement in the offense. He sincerely and deeply regrets his unlawful conduct as detailed in his Statement of Acceptance of Responsibility. He willfully and knowingly provided investors and government agencies with false information upon which they relied and based business decisions involving TBW and Ocala Funding.

### III. COOPERATION

Concerning Paul Allen's cooperation, the Court is respectfully referred to the Government's Motion for a Downward Departure from the Guidelines and Memorandum in Support thereof, which counsel has been advised will be filed with the Court.

### IV. ADDITIONAL ACCEPTANCE OF RESPONSIBILITY AND COOPERATION

Paul Allen asks the Court to recognize that he has voluntarily settled by consent judgment, stipulation or withdrawal of opposition of debarment, regulatory allegations and actions against him by The Office of Thrift Supervision (OTS), the Securities and Exchange Commission (SEC), and the Department of Housing and Urban Development (HUD).[3] The cumulative effect of these actions will preclude Paul Allen from being employed in or acting as a consultant or advisor in the mortgage or related financial industries that have comprised his life's work for over thirty years. The financial aspect of this loss, as well as the loss of his reputation and professional standing, are profound and immeasurable.

### V. LEGAL STANDARD

In *Rita v. United States*, 127 S. Ct. 2456, 2474 (2007), Justice Stevens wrote in his concurring opinion: "I trust that those judges who have treated the Guidelines as virtually mandatory during the post-Booker interregnum will now recognize that the Guidelines are truly advisory." The decisions in *Kimbrough v. United States*, 128 S. Ct. 558 (2007) and *Gall v. United States*, 128 S. Ct. 586 (2007) have reinforced Justice Stevens' analysis. Sentencing courts clearly have the authority to fashion the sort of sentence that fits the crime and the

---

[3] OTS has already issued an Order of Prohibition, the SEC has the Consent of Defendant Paul R. Allen with a Judgment expected shortly and HUD has issued a Notice of Final Determination for an eighteen (18) month debarment effective June 6, 2011. All are attached to the PSR before the Court.

individual.

In *Kimbrough*, the court described role of the Guidelines in relation to 18 U.S.C. § 3553(a):

> The statute, as modified by [*United States v. Booker*, 543 U.S. 220 (2005)], contains an overarching provision instructing district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a) (2000 ed. and Supp. V). The statute further provides that, in determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Ibid*. In sum, while the statute still requires a court to give respectful consideration to the Guidelines, see *Gall v. United States*, *ante*, 128 S. Ct. 586, 169 L. Ed. 2d 445, *Booker* "permits the court to tailor the sentence in light of other statutory concerns as well," 543 U.S., at 245-246, 125 S. Ct. 738.

*Kimbrough*, 128 S. Ct. at 570.

In *Gall*, the court rejected the proportionality test that flowed from the holding of so many circuit courts that had held that an extraordinary departure required "extraordinary circumstances." *Gall*, 128 S. Ct. at 594-595. The court went on to describe the Guidelines as a "starting point," but also emphasized the need for an "individualized assessment":

> As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. See *Id.*, 127 S. Ct. 2456, 168 L. Ed. 2d 203. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major

12

> departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing. *Id.*, 127 S. Ct. 2456, 168 L. Ed. 2d 203.

*Gall*, 128 S. Ct. at 596-597.

Following *Kimbrough* and *Gall*, in *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007), the Court of Appeals for the Fourth Circuit affirmed the district court's downward variance from the Guidelines as "reasonable and premised on the factors set forth in § 3553(a)." In so doing the court determined that the district court correctly found in the exercise of its discretion that other facts warranted a sentence lower than that recommended by the Guidelines range. In *Pauley*, the Fourth Circuit held that in the post-*Gall* world, that a sentence that constitutes a substantial variance from the Guidelines range need not be justified by extraordinary circumstances so long as the district court cautiously considered all of the relevant § 3553(a) factors in imposing a reasonable sentence. Furthermore, in deciding *Pauley*, the Fourth Circuit noted in *Gall* that the Supreme Court held it "quite reasonabl[e]" for the sentencing court to have "attached great weight" to a single factor." *Pauley*, 511 F.3d at 476.

"When sentencing a defendant, a district court must: (1) properly calculate the guideline range; (2) treat the guidelines as advisory; (3) consider the factors set out in 18 U.S.C. § 3553(a); and (4) explain its reasons for selecting a sentence." *Pauley*, 511 F.3d at 473. Under § 3553(a), a sentencing court must consider:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;
2) the need for the sentence imposed—
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

13

3) the kinds of sentences available;
4) the kinds of sentence and the sentencing range established by the United States Sentencing Commission;
5) any pertinent policy statement…;
6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

## VI.  CONSIDERATIONS WARRANTING A VARIANCE AND A LENIENT SENTENCE

§ 3553(a)(1) of Title 18 directs the Court to consider, first and foremost, "the nature and circumstances of the offense" and "the history and characteristics of the defendant."  It is respectfully suggested that these primary considerations, which are more fully addressed in the previous sections of this memorandum, present compelling reasons for leniency in this case.  But for the offenses giving rise to this instant matter, Paul Allen has never been involved in illegality of any nature, and the numerous letters of support speak volumes as to his character and positive characteristics and attributes.  In consideration of the other § 3553(a) factors, it is respectfully suggested that our plea for leniency rests on ample support.

A.  <u>Need for the Sentence Imposed.</u>  § 3553(a)(2) directs the Court to consider the "need for the sentence imposed" in light of four factors.  All these factors favor leniency.

**(1)  Seriousness of the Offense, Respect for the Law, and Just Punishment.**  No one can question the seriousness of this offense. However, the seriousness of the offense should not negate, diminish or render a nullity other statutorily proscribed sentencing considerations.  But for the matter now before this Court, Paul Allen has led a life of earnest family and honest business pursuits.  Being painfully aware of the seriousness of the offense and, in hindsight, what he should have done to curtail it, has, if anything, heightened Paul Allen's respect for the law and just punishment.  The shame to which he has been subjected before his friends, family and professional associates is immeasurable.  The loss of his ability to earn an income in an industry

14

to which he has devoted his life is punishment which will follow him forever. In short, we respectfully suggest that given the previously discussed limited role Paul Allen had in the overall TBW conspiracy, his punishment has already been severe and he will forever regret his participation in the illegal conduct.

**(2)** **Deterrence.** The life-altering impact of the criminal charges to which Paul Allen has pleaded guilty ("special deterrence"), his otherwise lawful past, and his extensive and ongoing cooperation with the government, constitute more than adequate assurance against his commission of future offenses, offenses which in the instant case can best be characterized as tragic and aberrational. Moreover, the impact of Paul Allen's decision to participate in the TBW fraudulent scheme and the impact of that decision on him and his family will reverberate in the financial community, regardless of the imposition of incarceration ("general deterrence"). His fall from grace has been dramatic and has taken place in a very public and painful fashion. His career has been ruined and his life's work has been eviscerated. It is submitted that, although a sentence of incarceration would certainly be an additional factor of deterrence, given the life-altering consequences on Paul Allen and his family, in this case it is not necessary to deter others who have witnessed or will become aware of his fall from grace.

**(3)** **Protecting the Public from the Defendant.** Paul Allen does not present a danger to the public, physically or otherwise.

**(4)** **Correctional Treatment for the Defendant.** This factor is inapplicable to Paul Allen; Paul Allen does not require educational or vocational training, medical care, or other correctional treatment.

B. 18 U.S.C. § 3553(a)(3), § 3553(a)(4), and § 3553(a)(5) require the Court to look to sentences "available" and those specified by the Sentencing Guidelines and by Sentencing

15

Commissions policy statements. These considerations are, of course, "truly advisory", *Rita*, 127 S. Ct. at 2474, and a "starting point", *Gall*, 128 S. Ct. at 594-595. Premised on the Government's Motion for Downward Departure, if accepted by the Court, and giving due consideration to the life Paul Allen has led, his role in the overall TBW conspiracy and the affect his incarceration will have on his family and community, it is submitted that asking this Court to sentence Paul Allen to a minimum period of incarceration with a home detention component is appropriate.

   C. <u>Sentencing Disparities.</u> 18 U.S.C. § 3553(a)(6) directs the Court to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The Court has sentenced TBW's President Raymond Bowman to a period of thirty (30) months of incarceration and its Treasurer Desiree Brown to a period of seventy-two (72) months of incarceration.

   Although clothed with the title of CEO, Paul Allen did not have the authority and control that a CEO might have been expected to exercise. Nor was he treated as a traditionally-rolled CEO by Farkas, Bowman or Brown. And, as the attached matrix illustrates, his involvement certainly did not equal theirs. See Exhibit A attached hereto.

   Accordingly, we ask that the Court take these factors and the sentences meted out to the other defendants into consideration when imposing sentence on Paul Allen.

   D. <u>Restitution.</u> 18 U.S.C. § 3553(a)(7) directs the Court to consider the "need to provide restitution to any victims of the offense." It is counsel's understanding that the government is going to ask that the issue of restitution be addressed after the sentencing of Farkas.

## VII. POSITION WITH RESPECT TO SENTENCING FACTORS AND MATERIAL FACTS

The PSR prepared by the U.S. Probation Office, to which Paul Allen has no objection, has calculated his Guideline period of incarceration to be 120 months, the statutory maximum for the two-count consecutive sentences. As part of his cooperation and substantial assistance to the government, the United States is expected to file a Motion for a Downward Departure, seeking a 40% reduction in Paul Allen's sentence from the statutory maximum, which, if accepted by this Court, will result in 72 months of incarceration. We ask that the Court take into consideration those 18 U.S.C. § 3553 sentencing factors addressed in this Memorandum to arrive at a much more lenient, and, we submit, more just sentence.

## VIII. CONCLUSION

We respectfully ask the Court to grant the Government's Motion for Downward Departure and to consider the information concerning substantial assistance contained in that motion, along with the information contained in the PSR prepared by the Probation Office, along with the attachments thereto, as well as the factors cited in this Sentencing Memorandum. In doing so, it is submitted that an analysis of controlling U.S.S.G. precedent, with a review and application of the 18 U.S.C. § 3553(a) sentencing factors, provides a sufficient factual basis for the Court to vary substantially from the Guidelines. We ask the Court to place appropriate weight on not only in what Paul Allen was involved but, more significantly, we suggest, in what Paul Allen was not involved.

Finally, we ask the Court to consider Paul Allen's trial testimony and the closing remarks of AUSA Connolly in determining the functional reality of Paul Allen's title of CEO at TBW. In so doing, we respectfully ask this Court to sentence Paul Allen, the man, and not Paul Allen, the title, to a minimal period of incarceration and home detention, to allow him to return to his

family and community as soon as possible. We also ask that Paul Allen be allowed to self-surrender, with the Court's recommending designation by the Bureau of Prisons to a facility which has a minimum security classification and is reasonably close to the residence of his wife and children.

                                                      Respectfully submitted,

                                                      _____/s/_____,
                                                      Stephen D. Graeff, Esq.
                                                      Virginia State Bar No. 77720
                                                      Carr, Morris & Graeff, P.C.
                                                      8300 Boone Blvd., Suite 250
                                                      Vienna, VA 22182
                                                      Telephone: (703) 288-2900
                                                      Facsimile: (703) 288-9550
                                                      sgraeff@cmgpc.com

                                                     _____/s/_____,
                                                      Thomas K. Berger, Esq.
                                                      Virginia State Bar No. 14127
                                                      Of Counsel
                                                      Carr, Morris & Graeff, P.C.
                                                      8300 Boone Blvd., Suite 250
                                                      Vienna, VA 22182
                                                      Telephone: (703) 288-2900
                                                      Facsimile: (703) 288-9550
                                                      tberger@cmgpc.com

                                                      Counsel for Defendant

June 13, 2011

**CERTIFICATE OF SERVICE**

       I hereby certify that on the 13th day of June, 2011, I electronically filed the foregoing Defendant's Sentencing Memorandum and Position with Respect to Sentencing Factors and Material Facts with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

       AUSA Charles F. Connolly
       AUSA Paul J. Nathanson
       Office of the United States Attorney
       2100 Jamieson Avenue
       Alexandria, VA 22314
       charles.connolly@usdoj.gov
       paul.nathanson@usdoj.gov


       /s/      ,
Thomas K. Berger, Esq.
Virginia State Bar No. 14127
Of Counsel
Carr, Morris & Graeff, P.C.
8300 Boone Blvd., Suite 250
Vienna, VA 22182
Telephone: (703) 288-2900
Facsimile: (703) 288-9550
tberger@cmgpc.com