IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:11-CR-165 |
| | ) | |
| v. | ) | Honorable Leonie M. Brinkema |
| | ) | |
| PAUL ALLEN | ) | Sentencing Date: June 21, 2011 |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Denis J. McInerney, Chief, Fraud Section of the Criminal Division of the United States Department of Justice, Patrick F. Stokes, Deputy Chief, and Robert A. Zink, Trial Attorney, and Neil H. MacBride, United States Attorney for the Eastern District of Virginia, Charles F. Connolly and Paul J. Nathanson, Assistant United States Attorneys, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "U.S.S.G.") § 6A1.2 (Nov. 2010), files this Position of the United States With Respect to Sentencing of the defendant, Paul Allen. For the reasons discussed herein, the government requests that the Court sentence the defendant to an initial term of incarceration of ten years – the statutory maximum – and then reduce that sentence by 40% based on the defendant's substantial assistance to the government's investigation for a final sentence of six years' (72 months') incarceration.

*Background*[1]

Taylor, Bean & Whitaker Mortgage Corp. ("TBW") was a mortgage company based in Ocala Florida. Colonial Bank was one of the 25 largest depository banks in the country and was based in Montgomery, Alabama. Colonial's Mortgage Warehouse Lending Division ("MWLD") provided financing to mortgage origination companies, including TBW. Paul Allen joined TBW in 2003 as the CEO. At all times he reported directly to Lee Farkas, the chairman and principal owner of TBW.

From approximately 2002 through August 2009, Farkas and numerous co-conspirators, including Allen, defrauded three banks of more than $2.9 billion, misled shareholders of Colonial BancGroup, Inc., and attempted to fraudulently obtain more than $500 million from the government's TARP program.

The conspiracy consisted of five separate schemes:

1. **Overdraft / sweeping scheme:** Beginning in 2002, Farkas and other co-conspirators engaged in a "sweeping" scheme to hide overdrafts in TBW bank accounts held at Colonial Bank. TBW ran large overdrafts in its Master Account to cover its operating expenses. To cover up the overdrafts, conspirators "swept" funds on a daily basis into this account from the Investor Funding Account, a Colonial Bank-controlled account. The sweeping scheme, which grew to approximately $140 million, continued until approximately December 2003. In addition to Farkas, other co-conspirators participating in the sweeping scheme included Ray Bowman, President of TBW, Cathie Kissick, head of the MWLD at Colonial Bank, and Teresa Kelly, an MWLD operations supervisor.

---

[1] In light of this Court's familiarity with the facts of this case, the Government includes only a brief overview and recitation of the key facts.

2.  **Plan B on COLB.**  In December 2003, Farkas and Kissick implemented "Plan B," a new phase of the scheme in which they caused the deficit covered up by the sweeping scheme to be moved to the COLB facility.  While Plan B was initially supposed to be a one-time event, the conspirators continued to engage in Plan B transactions for years.  Under Plan B, conspirators caused TBW to engage in fake sales of mortgage assets to Colonial Bank.  TBW pretended to sell mortgage loans to Colonial Bank, and the bank advanced TBW money for the loans.  In fact, the mortgage loans either did not exist or had already been sold to other banks or investors.  By mid-2005, Colonial Bank held approximately $250 million in Plan B loans on its books.  Farkas, Kissick, Bowman, Desiree Brown – TBW's Treasurer – and Kelly also participated in Plan B.

3.  **Plan B on AOT.**  Plan B on COLB grew to approximately $250 million and, because of the number of loans involved, became difficult for the conspirators to administer.  In 2005 the conspirators moved Plan B from COLB to Colonial's Assignment of Trade (AOT) facility.  The AOT facility was intended for the purchase of pools of loans that TBW was in the process of selling or securitizing.  Under this new version of Plan B, the conspirators engaged in fake sales of pools of loans to Colonial Bank, and in return TBW received over $1.3 billion from Colonial Bank from mid-2005 through mid-2008.  The Plan B pools of loans that TBW sold Colonial Bank consisted of nothing more than data for pools of loans that TBW had already sold to other investors.  As such, the Plan B data were worthless to Colonial Bank.  TBW paid down some of the Plan B balance on AOT over time, and by August 2009 Colonial Bank held approximately $500 million worth of worthless Plan B pools on the AOT facility.  Co-conspirators involved with Plan B on AOT included Farkas, Kissick, Brown and Kelly.  As a result of Plan B, Colonial BancGroup, the public holding company for the bank, significantly overstated the mortgage

assets held by the MWLD in BancGroup's public financial filings, including its annual reports (Forms 10-K) and quarterly reports (Forms 10-Q).

    4. **Ocala Funding ("OF").** OF was a standalone subsidiary of TBW. It was designed to provide low-cost funding to TBW for additional mortgage loan originations. It was also set up to be bankruptcy remote. OF issued commercial paper (corporate IOUs) to investors in return for cash. OF would then use the cash to fund mortgage loans at TBW. OF was required to have at all times more assets (cash + loans) than liabilities (the commercial paper). And, OF cash could only be used for OF purposes.

    When TBW ceased operations in August 2009, there were two investors in OF: Deutsche Bank ("DB") and BNP Paribas, which owned a combined approximately $1.75 billion in commercial paper. Farkas and other co-conspirators caused nearly all of the assets in OF to be stripped out and used to pay other TBW expenses, including mandatory servicing advances to investors in mortgage bonds TBW had sold. To cover up the missing assets, Farkas and other co-conspirators caused OF loans already sold to Freddie Mac to continue to appear as collateral at Colonial Bank and OF. As a result, Colonial Bank believed it owned $900 million in loans that had already been sold to Freddie Mac, and DB and BNP Paribas, as the investors in OF, believed they had approximately $1.67 billion in loan collateral backing their supposedly asset-backed commercial paper when in fact there was only collateral of roughly $160 million. Paul Allen, Desiree Brown, and Sean Ragland – a TBW financial analyst – facilitated the conspiracy by causing false collateral reports to be sent to DB and BNP Paribas as well as the custodian for OF, LaSalle Bank (purchased by Bank of America in 2007), that inflated by hundreds of millions of dollars the actual value of the collateral backing the commercial paper. Bowman was aware of the collateral deficit in OF, but was not actively involved in the OF phase of the scheme.

Kissick and Kelly were not involved in the OF phase of the fraud scheme, and Colonial Bank was a victim of this fraud.

    5. **Capital Raise.** In the fall of 2008, Colonial BancGroup, Colonial Bank's holding company, applied for more than $550 million of TARP funds. Colonial BancGroup was approved for $553 million contingent upon its raising an additional $300 million in private capital. In early 2009, TBW undertook to lead the capital raise. TBW said it would invest $150 million itself and would find two private equity investors to invest $50 million each. Colonial BancGroup undertook to raise the remaining $50 million from other companies with which it did business. Ultimately, Colonial BancGroup announced on March 31, 2009, that it had met its contingency. That was false; TBW had falsely represented the participation of the two $50 million private equity investors and misrepresented where the 10% deposit for TBW itself had come from. Moreover, Colonial BancGroup's TARP application, which incorporated the bank's financial statements, was materially false in that the fraud scheme caused the bank to significantly overstate the value of mortgage assets on its books. Farkas and Allen were involved in falsely representing the participation of the two $50 million private equity investors. Brown assisted Farkas in obtaining a $25 million deposit on behalf of TBW and the two equity investors by taking the money from OF. While Kissick was not aware of Farkas's misrepresentations regarding the equity investors, she knew that Colonial BancGroup's TARP application relied upon false bank financial data. Bowman, Kelly and Ragland were not involved in this aspect of the fraud scheme.

    Ultimately, six co-conspirators, including Allen, pleaded guilty to their involvement in the conspiracy and fraud scheme and agreed to cooperate with the government. On April 19, 2011, Lee Farkas was convicted by a jury of all 14 counts of the indictment.

*Argument*

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Guidelines are now advisory. *United States v. Booker*, 543 U.S. 220, 261 (2005). As such, "[i]n the wake of *Booker* . . . the discretion of the sentencing court is no longer bound by the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). The Supreme Court subsequently clarified that this means that the sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007), *quoted in Nelson v. United States*, --- US ----, 129 S.Ct. 890, 892 (2009). Nevertheless, "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Instead, at sentencing a court "must first calculate the Guidelines range." *United States v. Nelson,* 129 S. Ct. at 891; *see also United States v. Hughes*, 401 F.3d at 546 (holding that a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'") (*quoting United States v. Booker*, 542 U.S. at 264). After appropriately calculating the Guidelines, a sentencing court must then consider the Guidelines range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate for the individual defendant. *United States v. Nelson,* 129 S. Ct. at 891-92, *see also United States v. Hughes,* 401 F.3d at 546.

I.   THE APPROPRIATE GUIDELINES RANGE

Allen pleaded guilty to a two-count criminal information. Count one charged him with conspiracy to commit bank fraud, wire fraud and securities fraud in violation of 18 United States Code, § 371. Count two charged him with false statements in violation of 18 United States Code, § 1001. Both counts have a five-year statutory maximum period of incarceration. The

Probation Officer found, and the parties stipulated in the plea agreement, that the two counts group for purposes of determining the appropriate Guidelines level. *See* U.S.S.G. § 3D1.2(c).

The Probation Officer calculates that Guidelines offense level to be 46. In particular, the Probation Officer includes a base offense level of six, a 30-level adjustment for a loss of more than $400 million, a six-level adjustment for the number of victims, a three-level enhancement for role in the offense, a two-level enhancement for abuse of trust, a two-level adjustment for sophisticated means, and a three-level reduction for acceptance of responsibility. The government believes the Probation Officer calculated the Guidelines Range correctly. Allen either stipulated to each of these adjustments and enhancements in his plea agreement or did not object to their inclusion in the PSR. The resulting Guidelines range is life.

Although Allen faces a five-year statutory maximum per count of conviction, U.S.S.G. § 5G1.2(d) of the Guidelines directs the Court to impose any periods of incarceration consecutively to give maximum effect to the established Guidelines' range. *See,* U.S.S.G. § 5G1.2, comment n.1 ("If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment."). Thus the statutory maximum is ten years incarceration.

**II.** **SENTENCING RECOMMENDATION**

Allen was the chief executive officer of TBW. Early on he was ordered by Lee Farkas not to talk directly to TBW's largest partner – Colonial Bank – and he had difficulty getting any information from the treasury department. Nevertheless, Allen remained at TBW and became the lead manager for Ocala Funding, a multi-billion dollar, special purpose entity designed to provide TBW with additional financing. Along with Farkas, Allen was intimately involved in the formation of Ocala Funding and was the principal interface with investors. Allen understood

how Ocala Funding was structured and how it was supposed to operate.  And although Ocala Funding was not established to further the overall conspiracy, the Ocala Funding scheme resulted in a loss of approximately $2.4 billion, the largest single portion of the nearly $3 billion in loss caused by the overall conspiracy.

Allen played a significant role in the Ocala Funding fraud.  He learned of the growing collateral shortfall early on, he approved of a subordinate's falsifying monthly financial reports in an effort to mislead the investors, and he was fully aware that his actions were fraudulent.  As the lead manager of the Ocala Funding facility, Allen was frequently updated as to the growing collateral shortfall.  He knew that Sean Ragland, a senior financial analyst who reported through the CFO to Paul Allen was repeatedly falsifying monthly reports and that those reports misled the key investors as to the status of their investment.

Allen was also involved in the capital raise. At Farkas's direction, Allen solicited two entities, a private hedge fund and a brokerage firm, to be $50 million investors in the capital raise.  Ultimately, these investors were unwilling and unable to invest, but Farkas represented to Colonial Bank and to regulators that in fact these firms had invested.  Allen knew about these misrepresentations, and the government's evidence showed that he attempted to convince both entities to pretend to be investors in case they were contacted by regulators.  Allen also assisted in forwarding to a regulator a misleading letter confirming that money had been deposited on behalf of these investors when the money had been taken from Ocala Funding instead.  Finally, Allen was aware of efforts to falsely inflate the MSR values and he discussed with the CFO the creation of a "plug" number to use in TBW financial statements in an effort to hide the fact that the company was operating a deficit.

As chief executive officer, Allen was well-compensated. He earned approximately $400,000 a year and on a number of occasions received cash bonuses of approximately $100,000. The evidence shows, however, that Allen did not receive direct compensation from the fraud scheme. And his role in the conspiracy was more limited than some of the other co-conspirators. He was not actively involved in sweeping, Plan B on COLB, or Plan B on AOT. He worked primarily from his home in Northern Virginia and was cut-off from certain parts of the company by Lee Farkas. The government's evidence also indicated that Allen did not participate in and was not privy to discussions with Farkas and Brown about the diversion of Ocala Funding money to cover TBW expenses. For this reason, the government agreed to charges that established a ten year statutory maximum period of incarceration. The Guidelines call for imposition of that statutory maximum. Given Allen's senior position at TBW, his role in Ocala Funding and the capital raise, and the staggering losses caused by the overall conspiracy, the government asks this Court to impose the statutory maximum as an initial sentence before reducing it pursuant to the government's substantial assistance motion.

### III.   THE 18 U.S.C. § 3553(A) FACTORS

After calculating the appropriate Guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006) (quoting *Green*, 436 F.3d at 455). Section 3553(a) directs the sentencing court to consider various factors including the nature and circumstances of the offense and characteristics of the defendant. In addition, § 3553(a) states that the court must consider other factors, including the need for the sentence "to reflect the seriousness of the

offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B).

### A. *An Initial Sentence of Ten Years Incarceration Is Appropriate and Reasonable in Light of the Nature of Defendant's Criminal Conduct*

One key factor that the Court must consider is the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The defendant in this case participated in a massive fraud scheme, one of the longest-running and largest bank-fraud operations in history. While the overall scheme spanned eight years, the defendant's active participation in Ocala Funding began in the fall of 2005. He also was aware of fraudulent activity at TBW including the effort to inflate the value of MSRs. As the CEO of TBW and one of the lead managers of Ocala Funding, Allen assisted Farkas's efforts to steal hundreds of millions of dollars from Deutsche Bank and BNP Paribas through Ocala Funding.

Allen's important – although limited – role in one of the largest fraud schemes in recent history warrants a substantial sentence, and we believe imposing an initial sentence at the statutory maximum of 10 years before applying a reduction for substantial assistance appropriately reflects the nature and circumstances of the crime and his history and characteristics.

### B. *An Initial Sentence of Ten Years Is Necessary to Provide A Reasonable Deterrent Factor*

The Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). Fraud cases are serious offenses, and those who commit such offenses deserve particularly severe sentences because the nature and complexity of the fraud they commit requires such significant time and resources to detect,

prosecute, and deter. A ten year initial sentence would appropriately reflect the seriousness of the offense and provide just punishment in this case.

As this Court recognized at the sentencing of co-conspirator Ray Bowman, general deterrence is a key factor that the court must consider when evaluating the appropriate period of incarceration in a fraud case.[2] This is particularly true for Paul Allen, who like Ray Bowman, was a very senior executive of TBW and was aware of fraudulent activity there for numerous years. Although Allen was not a typical CEO and although he worked primarily out of his home in Northern Virginia, he still was a senior executive in a company that employed approximately 2000 people and he earned a substantial salary of over $400,000 a year. Imposing an initial sentence of ten years would afford the necessary general deterrence, as required by 18 U.S.C. § 3553(a)(2)(B). It would also impress upon others that participation in any fraud scheme for years on end will not be treated lightly or tolerated.

General deterrence alone can justify lengthy sentences, even where such long sentences are not necessary to achieve specific deterrence. *United States v. Sagendorf*, 445 F.3d 515, 518 (1st Cir. 2006). Fraud offenses are serious, and a lengthy sentence will ensure that would-be violators do not receive the message that the gain to be derived from defrauding financial institutions, shareholders, or the government outweighs the potential consequences. Here, where the defendant facilitated a massive fraud scheme over a series of years, a significant sentence is necessary to send a strong deterrence message to others.

If the sentence truly is to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct" it must be substantial. *See* 18 U.S.C. § 3553(a)(2). This is particularly true here in

---

[2] Allen's cooperation with the government's investigation suggests that he has fully accepted responsibility for his actions and is not likely to engage in such a fraud scheme again.

light of the size of the fraud scheme, its duration, and the substantial damage it caused. An insubstantial sentence would signal that the type of long-standing, egregious fraud in which the defendant engaged is somehow deserving of special consideration from the Court. Moreover, if individuals who defraud financial institutions and corporate shareholders and attempt to defraud the United States believe that the penalty for doing so is trivial, then no disincentive exists to prevent those who are best-equipped with the means and ability to commit fraud from doing so. An initial sentence of ten years before applying a reduction for substantial assistance is necessary to satisfy the requirements of § 3553(a)(2).

      **C.**    *The Need to Avoid Unwarranted Sentencing Disparities*

The Government's recommendation that the Court impose an initial sentence of ten years for Allen does not take into account sentences already imposed for Brown and Bowman. The Government has not modified its recommendation principally because all of its sentencing recommendations – for all cooperating defendants – were carefully considered relative to one another before any sentences were imposed. In so doing, the Government endeavored to provide the Court with insight into how the Government views the relative culpability (and cooperation) of each defendant. The Government expects that the Court will impose Allen's sentence in a manner consistent with both Brown and Bowman, and in a way that will avoid any unwarranted sentencing disparities between Allen and the other co-defendants who pleaded guilty and testified against Farkas.[3]

---

[3] The government has included a chart in its under-seal motion for a reduction in sentence that contains its sentencing recommendations, including suggested reductions for substantial assistance, for each of the cooperating co-defendants. In addition, the government has a more fulsome explanation of the comparative culpabilities of the six cooperators in the sentencing position it filed with respect to Desiree Brown.

The Government's recommendation for Allen falls in the middle of its recommendations for the cooperating co-conspirators. This recommendation recognizes both: (1) Allen's role as the CEO for TBW and a key manager of Ocala Funding, the size of the Ocala Funding fraud, his role in furthering the material misrepresentations made with respect to Ocala Funding, and his role in the Capital Raise; and (2) the fact that he was cut off from certain information at TBW and had no role or information with respect to the fraud scheme related to Colonial Bank.

Comparatively, the Government intends to recommend a substantially higher sentence for Farkas. Farkas led the fraud scheme, in part, by manipulating his co-defendants and limiting the flow of information to them. He was the overwhelming beneficiary of the scheme, he stood to gain the most as the owner of TBW, and he lived a lavish lifestyle that none of his co-conspirators shared. Allen and his cooperating co-defendants' cases also are in a very different posture than Farkas's. They each pleaded guilty pre-indictment, fully accepted responsibility, have shown remorse for their actions, and cooperated substantially with the government's investigation. Thus, for Allen, an initial sentence of ten years will not create an unwarranted disparity with a much lengthier sentence imposed on Farkas.

**D.**     *Substantial Assistance Reduction*

For the reasons set forth in the government's motion for a downward departure, we ask this court to reduce Allen's ten-year initial sentence by 40% and impose a final sentence of six years' incarceration.

**E.**     *Restitution*

The government is still in the process of identifying victims and their loss amounts. The amount of potential restitution in this case is enormous, with some defendants potentially facing restitution orders of up to $2.9 billion. While it is unlikely that the victims will recover the full

amount from the defendants, the government needs additional time to identify victims and the amounts they are owed to ensure they are able to recover ratably from any restitution payments made by Allen (or the other defendants). Therefore, after consultation with defense counsel and pursuant to 18 U.S.C. § 3664(d)(5), the government respectfully moves the Court to defer the entry of the restitution order until after the Farkas sentencing hearing. In particular, the government requests a date approximately one week after the Farkas sentencing hearing to submit to the Court a proposed restitution order for Allen (as well as all other defendants) that reflects all of the victims identified to date. This will ensure that late-identified victims and changes to loss figures based on additional review are consistently reflected in each restitution order.

## *Conclusion*

The United States believes that an initial sentence at the statutory maximum is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a). The United States also asks that this Court grant the defendant a downward departure of 40% based on his substantial assistance to the government and impose a final sentence of incarceration of six years.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: _____/s/_____
Charles F. Connolly
Paul Nathanson
Assistant United States Attorneys
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: Charles.Connolly@usdoj.gov
Paul.Nathanson@usdoj.gov

Respectfully submitted,

Denis J. McInerney
United States Department of Justice
Chief, Criminal Division, Fraud Section

By: _____/s/_____
Patrick F. Stokes
  Deputy Chief
Robert Zink
  Trial Attorney
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Ph; 202.305.4232
Fax: 202.514.7021
Patrick.Stokes2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of June 2011, I filed electronically the foregoing Position of the United States with Respect to Sentencing using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Stephen Daniel Graeff
Carr Morris & Graeff PC (VA)
8300 Boone Blvd
Suite 250
Vienna, VA 22182
703-288-2900
Fax: 703-288-9550
Email: sgraeff@cmgpc.com

Thomas Kass Berger
Carr Morris & Graeff PC (VA)
8300 Boone Blvd
Suite 250
Vienna, VA 22182
703-288-2900
Fax: 703-288-9550
Email: berglaw@verizon.net

Karen Moran
Senior U.S. Probation Officer
Karen_Moran@vaep.uscourts.gov

/s/
Charles F. Connolly
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3771
Fax: (703) 299-3981
Email: Charles.Connolly@usdoj.gov